SAN MIGUEL FERTILIZER CORP., Plaintiff and Appellee, *v.* PUERTO RICO DRYDOCK & MARINE TERMINALS, Defendant and Appellant.

No. R-64-185.    Decided May 4, 1967.

---

404

*Fiddler, González & Rodríguez* and *Rafael R. Vizcarrondo* for appellant. *Francisco Ponsa Feliú* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Dávila, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

We are concerned here with the interpretation of a contract for the discharge of bulk material brought by vessel to Puerto Rico. The question for determination is whether under such contract the enterprise which bound itself to perform the discharge operations, through its facilities, may collect mooring and wharfage charges. The collection of said items was authorized by the Public Service Commission, by means of its Order of January 10, 1957. For the reasons set forth below we conclude that it may not, and that the judgment of the trial court to that effect should be affirmed.

### The Controversy

Prior to the year 1951, respondent, San Miguel Fertilizer Corporation (hereinafter called San Miguel) received the bulk material which it imported through the facilities of Puerto Rico Lighterage. On July 14, 1951, San Miguel and petitioner, Puerto Rico Drydock & Marine Terminals, Inc. (hereinafter called Drydock), signed a contract which, insofar as pertinent to the question under our consideration, provides that:

"1.—That DRYDOCK has leased at the present time from the United States Navy the dry dock owned by the latter with all its adjacent facilities.

"2.—That SAN MIGUEL receives frequently and by sea bulk material . . .

"3.—That both parties have entered into a contract for the discharge of all bulk material which SAN MIGUEL may receive from now on by sea, through the above-mentioned facilities and of which DRYDOCK is the lessee, . . ."

"CLAUSES

"FIRST: SAN MIGUEL binds itself to discharge all bulk material it may receive by sea from now on . . . through the facilities of DRYDOCK, and DRYDOCK, in turn, binds itself to discharge all bulk material received by SAN MIGUEL by sea from now on . . .

"SECOND: DRYDOCK will be entitled to collect, and SAN MIGUEL will be bound to pay, within a reasonable term after discharge, the rate agreed upon of $1.20-1/2 (one dollar twenty and a half cents) for each ton of 2,000 pounds of bulk material of SAN MIGUEL unloaded by DRYDOCK under the conditions herein stipulated.

"THIRD: The unloading by DRYDOCK will be carried out from the vessels in which the material arrives to the funnels which DRYDOCK has specifically installed for this purpose and to any other facilities which DRYDOCK may instal in the future after an agreement with SAN MIGUEL.

".     .     .     .     .     .     .     .

"FIFTH: The effectiveness of this contract will be the same as that of the lease contract not expired which exists now between DRYDOCK and the United States Navy on the aforementioned facilities, and will be subject to the conditions and contingencies thereof; provided, however, that any one of the parties, at any time, shall be entitled to request from the other a revision or adjustment of the rate of one dollar twenty and a half cents ($1.20-1/2) per ton agreed upon, provided it is justified by an increase or decrease in the cost of discharge."

On February 8, 1955 San Miguel and Drydock executed a complementary contract in which they agreed to clarify and implement the fifth clause of the contract executed on July 14, 1951. Said clause refers, insofar as pertinent, to the determination of the compensation for discharge services fixed on the basis of so much per ton, subject to revision or adjustment as a result of increase or decrease in the cost of discharge. To that effect it was stated in the complementary contract the cost items to be considered in the determination of the discharge rate per ton. Besides, it stipulated the pro-

ceeding to be followed for determining future discharge rates per ton. The aforesaid items are the wages of stevedores, foremen, crane operators, and firemen, other miscellaneous wages, wages for cleaning the area, for lost time (crane operators-firemen), an item for fuel oil, maintenance and repairs, depreciation, and finally, profits.

On August 29, 1958 San Miguel filed a petition for declaratory judgment in the Superior Court, San Juan Part, alleging that on July 14, 1951 it had signed the aforesaid contract; that it had been modified by a document executed by the parties on February 8, 1955; that a real and true controversy has arisen and exists between the contracting parties concerning the right of Drydock to collect from San Miguel, in addition to the items enumerated in the contract in force, as amended, certain mooring and wharfage charges, San Miguel's contention being that it has never been and is not bound to pay the aforementioned items nor any money on that account to Drydock, while the latter's contention is that San Miguel has always been bound to make such payments.

In its answer, Drydock alleged that San Miguel's obligation to pay for the mooring and wharfage charges does not arise from the contract executed as amended since it neither provides nor covers the mooring and wharfage charges. It indicates that said obligation arises from the Puerto Rico Public Service Act, from the orders and decisions of the Public Service Commission of Puerto Rico and from charter party agreements existing between San Miguel and the owners of the ships which bring the materials imported by the former since they specifically provide that the mooring and wharfage charges shall be for the account of the consignees and/or owners of the cargo.

The trial court decided that San Miguel was not bound to pay the mooring and wharfage charges to Drydock. It reached this conclusion on the basis, principally, of the par-

ties' conduct in enforcing the contract executed between them. It concluded, further, that neither San Miguel nor Drydock were parties to the said charter party agreements and therefore said contracts could not bind San Miguel to pay for mooring and wharfage.

### Assignment of Errors by Drydock

In support of its petition for review, Drydock assigns the following five errors allegedly committed by the trial court:

I—Said court committed error in deciding that San Miguel is not bound to pay mooring and wharfage charges to Drydock by virtue of the charter party agreements.

The trial court concluded that "Charter party agreements . . . do not create rights nor obligations between the litigants because said contracts are obligations between other contracting parties, neither San Miguel Fertilizer nor Puerto Rico Drydock being parties therein; § 1209 of the Civil Code, 1930 ed., 31 L.P.R.A. § 3374, establishes that 'contracts shall only be valid between the parties who execute them and their heirs, . . .'."

Drydock argues that San Miguel is bound to fulfil the condition of the payment of mooring and wharfage charges provided in the aforesaid charter party agreements, first because San Miguel was a party therein for they were nearly always signed by SMH Trading Corporation and this corporation and San Miguel are the same legal entity; and second, because, even if it were not, San Miguel was estopped from alleging the contrary, since it was the beneficiary of such contracts and upon accepting them and receiving benefit therefrom it was bound to assume the obligation to pay the mooring and wharfage charges provided in those contracts. *Ramírez* v. *Gautier*, 87 P.R.R. 470 (1963).

■■ We do not agree. The evidence does not show that San Miguel and SMH Trading Corporation were the same legal entity. The fact that the names were similar, that Mr. Marcelino San Miguel was stockholder of both corporations, that on one occasion SMH Trading Corporation wrote to Drydock on San Miguel's official printed stationery and that the circumstances led Drydock to believe that San Miguel and SMH Trading Corporation were the same person, is not the strong and robust evidence which would justify piercing the corporate veil of SMH Trading Corporation. Said evidence does not justify the conclusion that this corporation was an "alter ego" or business conduit of San Miguel or that there is between them such identity of interests and property that both corporations are merged, or that maintaining the fiction of two different entities in this case is tantamount to sanctioning a fraud or promoting an injustice or that the purpose of these two corporate structures is to evade compliance with a statutory obligation or defeat public policy, justify wrong, protect fraud or defend crime. *South Porto Rico Sugar Corp.* v. *Sugar Board,* 88 P.R.R. 42 (1963); *J. E. Candal & Co.* v. *Rivera,* 86 P.R.R. 481 (1962); *Heirs of Pérez* v. *Gual,* 76 P.R.R. 898 (1954); *Cruz* v. *Ramírez,* 75 P.R.R. 889 (1954).

There is no doubt that San Miguel was a beneficiary of the charter party agreements by virtue of which raw material was transported in bulk from different places in Europe and in the United States consigned to San Miguel to be used in its fertilizer plant, material received and accepted by San Miguel when each vessel was unloaded in Drydock's facilities. San Miguel had to pay *a fortiori* for the service of transportation. This obligation included that of mooring and wharfage charges under those contracts which provided that the owner or consignee of the cargo would pay for these charges. But none of some 50 charter party agreements

admitted in evidence imposes the obligation of paying mooring charges to the owner of the cargo or consignee and in eight only, the so-called Booking Contracts is that the wharfage charged is for the account of the cargo.

On two occasions alone it appears that San Miguel contracted directly for the transportation of the material in question. It so appears from two letters, dated February 20, 1958 and April 3, 1959, addressed by González Chemical Industries, Inc., to Mr. Carlos de Jesús, of San Miguel, establishing the agreement between these enterprises with respect to the transportation in bulk of certain material. It does not appear therefrom who agreed to pay for mooring and wharfage charges.

It is evident from the foregoing that the liability for mooring and wharfage charges in relation to the discharge of bulk material consigned to San Miguel does not fall on the latter by virtue of the provisions of the charter party agreements, except specifically in the case of the Booking Contracts. However, as we shall see further, notwithstanding the provisions in those eight contracts, San Miguel is not bound to pay the charges in question.

II—The trial court erred in deciding that Drydock is not entitled to collect from San Miguel mooring or wharfage charges because the 1951 contract as modified contains everything that the former is entitled to collect from San Miguel.

III—The trial court erred in concluding that during several years after the effectiveness of the contracts, Drydock did not claim at any time from San Miguel the payment of mooring and wharfage charges.

We shall discuss these assignments of error jointly insofar as they are closely connected.

The trial court did not commit these errors except that, as to the third one, the truth is that on October 8 and 15, 1952 Drydock billed San Miguel for one of these two items, that is, for mooring.

In support of these assignments, Drydock (A) argues that the contract in question does not cover all the items for which it is entitled to collect, for it refers only to discharge services; that mooring and wharfage were not considered in the contract for the purposes of their payment or nonpayment; that any doubt left as to whether the 1951 contract covered these charges was clarified by the complementary agreement of 1955. In this agreement the rate agreed upon for discharge service was increased and it specified the different items or elements which added, composed said service. (B) It indicates, for the purpose of rebutting the contention that all the charges it was entitled to collect are covered by the contract, that San Miguel has paid for other services concerning the bulk material to which the contract refers such as weighing the material, cargo shifting, and cleaning the holds of the vessels. (C) It argues, further, that saying that the contract relieves San Miguel from paying mooring and wharfage charges is tantamount to saying that Drydock has made a donation to San Miguel since it would not be collecting for something to which it is entitled and for which all the other entities which use its dock pay; and (D) it accuses San Miguel of unjust enrichment in not paying for the mooring and wharfage charges.

We shall proceed to consider Drydock's contentions in the same order in which they have been set forth. For the sake of greater clearness it is necessary to indicate that Drydock, speaking through its official, José Miguel Peña, defined mooring as "a fee charged to the vessel for being moored to a dock to unload or load or to do any operation; . . ." and "wharfage is the charge made to the cargo or to the consignee . . . for passing and using the facilities of the dock."

Mr. Carlos R. de Jesús, official of San Miguel, testified in this respect that "Wharfage is the passing of goods through the facilities of a dock . . . That concerns the goods which use

the facilities of a dock." He stated further that "Mooring is a charge made directly to the vessel for using the facilities for being moored to the dock."

—A—

First it is necessary to indicate the rule of construction for the purpose of determining the scope of the contract in question and more specifically for the purpose of determining whether or not the charge for the service of unloading provided therein includes mooring and wharfage charges.

■■ Section 1234 of the Civil Code, 31 L.P.R.A. § 3472, provides that:

"In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."

In the case of *Rutledge* v. *Gill*, 78 P.R.R. 665, 672 (1955), we stated that:

". . . In order to judge the intention of the contracting parties, we must pay attention principally to their acts, contemporaneous and subsequent to the contract and if any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect. Furthermore, the stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together. Sections 1234, 1236 and 1237 of the Civil Code (1930 ed.). *Caballero* v. *Kogan,* 73 P.R.R. 617."

■ (1) Let us turn to the contract executed by the parties. It is stated therein that the United States Navy has leased to Drydock a dry dock with all its adjacent *facilities* and that the parties have agreed that the bulk material received by San Miguel be unloaded through the above-mentioned *facilities*. In the first clause San Miguel agrees to unload the bulk material it may receive through Drydock's

facilities. The second clause fixes the rate agreed upon for discharge. The third clause establishes that *the discharge will be carried out from the vessels in which the material arrives to the funnels which Drydock has installed for this purpose* and to any other *facilities* which Drydock may instal in the future, after an agreement with San Miguel.

As it may be noted, the contract makes continuous reference to the fact that the bulk material received by San Miguel will be discharged through Drydock's *facilities* and to the manner in which that discharge is to be performed.

The continuous reference to the fact that the discharge will be carried out through Drydock's facilities tends to indicate that the facilities include (1) that the vessels be moored to the dock and (2) the use of the facilities of the dock.

In relation to the foregoing, Mr. Peña testified as follows:

"Q. Mr. Peña, do you have to use the dock for the discharge operation?

"A. Well, of course the vessel must be moored to the dock.

"Q. The question is whether you have to use the dock.

"A. It is not indispensable but the discharge is made easier if it is moored.

"Q. Do they always use the dock or not?

"A. They use it.

"Q. Have they always used it?

"A. They have always used it."

(2) The contract which provokes this controversy, as we have stated, was executed on July 14, 1951, for which reason, if Drydock's position is correct, it could claim, as of that date, the items which it now claims from San Miguel. However, its acts do not support its position. Let us see. It was not in the first opportunity available that San Miguel was charged for mooring and wharfage but it was charged for the first time about 15 months after the discharge contract had been executed. On this occasion both items were

not included in the invoices but only for mooring. For more precision this incident occurred for the first time the 8th and for the second time the 15th of October 1952. Immediately, that is to say, on October 21, 1952, San Miguel objected to the inclusion in the invoices of any charge for mooring.

Until February 8, 1955, date on which the 1951 contract was amended to increase the charge for unloading, the payment for mooring had not been required again nor at any time had wharfage charges been collected. We have then, that during the period from July 14, 1951 to February 8, 1955, wharfage charge was not claimed at any time, that is to say, said charge was not included in the invoices and the mooring charge was only included in two invoices (the invoices of October 8 and 15, 1952).

It appears from these acts of the parties that they believed that the contract for the unloading of bulk material through Drydock's facilities executed in 1951 precluded the collection, in addition to the items stipulated therein, for mooring and wharfage, that is to say, for mooring the vessels which brought this material for San Miguel to the dock and for the use of the facilities of the dock.

Drydock, as we have indicated, states that the complementary agreement executed in 1955 dissipates any doubt which there might be as to whether or not the contract covers the charges for mooring and wharfage. So we have it that if Drydock would have believed that with that clause its right to collect the mooring and wharfage charges was clear, it was to be expected that it would have collected them and that if they were not paid it would have asserted its "clear right." However, it is not after more than a year has passed from the date of the agreement that for the first time—since 1951—Drydock notifies San Miguel that wharfage charges will be collected.

In synthesis, let us see what occurs after the complementary agreement is executed. San Miguel introduced in evidence a set of invoices which covers the period from November 5, 1952 to September 29, 1955. In this set of invoices there are 14 which were sent to San Miguel after the agreement of 1955 was executed. No charge for mooring and wharfage was included therein. It can be inferred from this that after the agreement of 1955 Drydock did not intend to collect from San Miguel mooring and wharfage charges in the first opportunities it had.

It is in 1956 that San Miguel receives an invoice where charges for mooring are collected for the third time since the execution of the contract in 1951 and for the first time since the date of the 1955 agreement. Said invoice *was not sent by Drydock* but by another company, that is to say, Southern Steamship Co. It seems that Drydock collected from this company for mooring one of its vessels and that the latter sought to pass said charge to San Miguel. San Miguel did not pay for said item and what it did was to urge Drydock to credit it directly to Southern Steamship Co.

It is by means of the letter of March 20, 1956 that Drydock for the first time notifies San Miguel that it is going to charge for wharfage and it is on April 30, 1956 that the *first* invoice including wharfage was sent. Note that more than one year has elapsed since the date of the stipulation.

As to the mooring charge, Drydock collects it from San Miguel through the invoices of April 30, May 7, and May 10, 1956 for the first time since the incident of 1952. Note that more than a year has also elapsed since the execution of the stipulation.

It is subsequent to the three invoices to which we have referred, that in the succeeding invoices the items for mooring and wharfage are included. San Miguel did not pay

these items but deducted them from the invoices and paid the difference.

(3) Drydock explains its laches in procuring the payment of the charges which it now claims, indicating that at the time of the execution of the contract they usually collected those charges directly from the owner or agent of the vessel and that it was not until the vessels refused to pay for mooring and wharfage that Drydock tried to collect from San Miguel, in 1952. After this attempt to collect it was not until 1956 that it again sought to collect from San Miguel because there was a promise on the part of officers of San Miguel to the effect that they would instruct SMH Trading Corporation not to accept any more charter party agreements where the charges for mooring and wharfage were on the account of the consignees in order that Drydock could collect again directly from the vessels. "But when *three years* elapsed and Drydock's officers saw that the vessels indicated that the charter party agreements continued the same they decided to collect again from San Miguel."[1]

The former explanation of Drydock's delay in claiming the charges for mooring and wharfage does not find support in the 50 charter party agreements introduced in evidence which cover the period between 1956 and 1960. Taking said contracts as representative of the charter party agreements which governed the transportation of the bulk material received by San Miguel, it appears therefrom that only on 11 occasions the charterer was SMH Trading Corporation. Therefore, as in its great majority the charterers were enterprises different from SMH Trading Corporation, there was

---

[1] If the first time the wharfage item was collected was in 1956 it can hardly be true, as alleged, that they decided to collect it *again* since it had not been collected before. In any event what would be collected again would be the charge for mooring since we have seen that, in fact, it had been collected in 1952.

no reason at all for Drydock to expect that the alleged instructions to SMH Trading Corporation should produce the effect expected by Drydock, that is to say, that Drydock could collect again the above-mentioned items directly from the vessels. Besides, the fact that Drydock expected that change in the aforesaid contracts would indicate that it did not consider that it was entitled to collect it from San Miguel.

Drydock tells us in a part of its brief that the promise in question was to the effect that SMH Trading Corporation would be instructed not to accept charter party agreements any more where the charges were for the account of the consignees, while in another it says that the promise was to the effect that San Miguel would not accept more charter party agreements where mooring and wharfage charges were for the account of San Miguel. It can be seen that there is a manifest contradiction between these two statements. The evidence presented for this purpose was the testimony of Mr. Peña, Drydock's executive. What he testified to was that Mr. Martínez, officer of San Miguel, offered to instruct SMH Trading Corporation to collect directly from the vessels. To that effect Drydock addressed a letter on February 20, 1956 to San Miguel.

Moreover, if as we have said, we consider the charter party agreements as representative of those made to transport goods consigned to San Miguel, we find that in a vast majority of cases the charge is for the account of the charterer and not of the consignee.

As we have indicated, in 1952 the items for mooring and wharfage were not claimed but only one of them, that is to say, mooring, for which reason Drydock's argument explaining its delay in claiming them would be effective only as to mooring and not as to wharfage.

(4) It is proper to set forth an incident, which we deem persuasive, and which arises from plaintiff's Exhibit 12

and from the testimony of Mr. Carlos R. de Jesús, Vice President of San Miguel. This exhibit consists of 5 invoices, 4 of them for unloading *material in bags*; in three of them wharfage is collected and in another one charges are collected for mooring as well as for wharfage (it should be noted that the contract between the parties does not cover unloading material in bags). The remaining invoice is for unloading *bulk material* from vessel S/S Germa. Well then, one of the four invoices to which we have referred (for unloading material in bags) is also for unloading from the vessel S/S Germa and is of the same date as the invoice for unloading bulk material, that is to say, of October 11, 1955 (after the agreement of 1955 was executed). It would seem, then, that on the same date and from the same vessel material was unloaded both, in bags and in bulk. In the case of unloading material in bags, an invoice was made for wharfage, however in the case of the unloading of bulk material invoice for wharfage was not made—nor for mooring—this despite the fact that, as we have pointed out, the material was unloaded from the same vessel, on the same date, and while the 1955 agreement was in force. Thus we see that subsequent to said agreement and on this occasion, in the discharge operation of bulk material—covered by the contract—neither mooring nor wharfage was collected, yet in the discharge operation of material in bags—not covered by the contract—wharfage was collected.

(5) Mr. Marcelino San Miguel testified that he was one of the organizers of Abarca Drydock, which then passed to be the petitioner; that in order to induce San Miguel to change the discharge of bulk material from Puerto Rico Lighterage to Abarca Drydock, it was agreed that the conditions of the contract would be identical with those San Miguel had with Puerto Rico Lighterage; that it did not pay mooring nor wharfage to Puerto Rico Lighterage. For those purposes an invoice of the latter enterprise for discharge serv-

.ices which did not include the mooring nor wharfage charges was introduced in evidence. This evidence was not controverted.

—B—

As we have indicated, Drydock rebuts the contention that all charges which it is entitled to collect are contained in the contract. It indicates that San Miguel has paid for other services connected with the bulk material to which the contract refers, such as the weighing of said material, cargo shifting, and cleaning the holds of the vessels.

It was proper to collect for said services since, because of its nature, they cannot be considered as inherent to, or part of, the service of discharge agreed upon in the contract on which the controversy in this case is based, as may be said of the mooring and wharfage services.

From the facts, acts, and the other related circumstances, it is crystal clear that it was the intention of the parties in executing the contract that it would comprise the acts or concepts of mooring and wharfage.

—C—

In the light of the evidence presented and in view of the foregoing, the argument to the effect that to relieve San Miguel from paying to Drydock the mooring and wharfage charges is tantamount to saying that the latter made a donation to the former, lacks merit.

—D—

■ The allegation that San Miguel has unjust enrichment in not being bound to pay the aforesaid charges was based on the assumption that San Miguel, upon informing the shipping enterprises in question that it would take charge of paying mooring and wharfage charges, obtained

some economic profit therefrom. No evidence to support this statement was presented. Moreover, the application of the doctrine of unjust enrichment is not justified in this case. *Silva* v. *Industrial Commission,* 91 P.R.R. 865 (1965).

IV—The trial court erred in concluding that at the time the contracts were executed the mooring and wharfage charges were usually collected from the consignees or agents of the vessels.

Drydock sets forth that, according to the testimony of its executive, Mr. Peña, at the time the contracts in question were executed, the said charges were usually collected from the vessels and not from consignees, for which reason they were not mentioned in said contracts.

The evidence on this particular was Mr. Peña's testimony to the effect that the usual practice was to collect mooring and wharfage charges from the owner or agent of the vessel so that the foregoing conclusion of the trial court is not entirely correct. However, the undisputed testimony of Mr. Marcelino San Miguel was in the sense that he was one of the organizers of Abarca Drydock and that there were negotiations to induce him to transfer his discharge operations from the Puerto Rico Lighterage, where he did not pay mooring and wharfage charges, to the facilities of Drydock, for which reason it is logical to conclude that the parties believed that under the contract in controversy the charge for the service of discharge included the mooring and wharfage charges. Moreover, in view of the parties' conduct concerning the administration of the contract in question, as previously set forth, the possible inaccuracy in this conclusion of the trial court does not affect nor does it warrant our changing our judgment affirming the judgment of said court in this case.

V—The trial court committed error in imposing the amount of $300 upon Drydock for attorney's fees.

■ Concerning this particular we have held that the imposition of attorney's fees is a matter within the discretion of the trial court and that we shall not interfere with the trial court's determination in this sense unless the record shows that an abuse of discretion has been committed. In this case, taking all its circumstances into consideration, we believe that the trial court did not abuse its discretion. *Montañez* v. *Metropolitan Constr. Corp.*, 87 P.R.R. 35 (1962); *Wolf* v. *Neckwear Corporation*, 80 P.R.R. 519 (1958); *P.R. Housing Authority* v. *Colón*, 73 P.R.R. 208 (1952); *Giráu* v. *González*, 73 P.R.R. 393 (1952); *Rivera* v. *Meléndez*, 72 P.R.R. 404 (1951); *Torres* v. *Biaggi*, 72 P.R.R. 813 (1951); *Cerra* v. *Motta*, 70 P.R.R. 822 (1950).

For the reasons stated, the judgment rendered in this case by the Superior Court, San Juan Part, on July 9, 1964, will be affirmed.